**LEBURN SMITH, Appellant**

**v.**

**GOVERNMENT OF THE VIRGIN ISLANDS, Appellee**

D.C. Criminal App. No. 2005-23

District Court of the Virgin Islands

Division of St. Thomas and St. John

April 17, 2009

713

SHERMANE DAVIS-BRATHWAITE, ESQ., St. Thomas, USVI, *For the Appellant.*

RICHARD S. DAVIS, ESQ., St. Thomas, USVI, *For the Appellee.*

GÓMEZ, *Chief Judge of the District Court of the Virgin Islands*; FINCH, *Judge of the District Court of the Virgin Islands*; and BRADY, *Judge of the Superior Court, Division of St. Croix, sitting by designation.*

## MEMORANDUM OPINION

(April 17, 2009)

Leburn Smith ("Smith") appeals his conviction in the Superior Court of the Virgin Islands[1] for kidnapping for ransom, false imprisonment,

---

[1] At all times relevant to this appeal, the trial court was known as the Territorial Court of the Virgin Islands and its judges were referred to as Territorial Court Judges. Effective January 1, 2005, however, the name of the Territorial Court changed to Superior Court of the Virgin Islands. *See* Act of Oct. 29, 2004, No. 6687, sec. 6, § 2, 2004 V.I. Legis. 6687 (2004).

first-degree assault and grand larceny. For the reasons stated below, we will affirm Smith's conviction in its entirety.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On the evening of April 8, 2004, Elvis Burton ("Burton") went to Post Office Square in downtown Charlotte Amalie, St. Thomas, U.S. Virgin Islands, expecting to meet an acquaintance named Mauville Lake ("Lake").[2] After Burton arrived in Post Office Square, a car approached. Smith was in the driver's seat of the car, Lake was in the front passenger seat and an unidentified individual with dreadlocks was seated in the back. Burton had never before seen Smith or the unidentified individual. At Lake's invitation, Burton entered the car. Lake indicated that they were going to another area of St. Thomas "to get something." [Appellant's App'x Vol. I at 116.]

While en route, Burton recounted that he had been robbed the day before of two kilograms of cocaine by an individual. Burton had obtained that cocaine from a friend who lives in Tortola, British Virgin Islands. Lake told Burton that he knew the individual who had robbed him and could have helped had Burton called.

The car stopped near an apartment building in an area of St. Thomas known as Bovoni. The group entered one of the apartments, to which Smith had a key. While Burton and the unidentified individual waited in the living room, Smith and Lake disappeared into a bedroom. When Smith and Lake reemerged, Smith was holding a telephone cord. Smith struck Burton on the right side of his face, grabbed him and began binding his hands while Lake tied his feet. All the while, the unidentified individual trained a gun on Burton while Smith and Lake delivered additional blows to Burton's face and body. Burton's wallet and other personal effects were taken from him.

After immobilizing Burton, Smith, Lake and the unidentified individual put a cellular phone to his ear. They instructed him to call his Tortola friend and tell him to bring twenty kilograms of cocaine to St. Thomas. Over the phone, Burton's friend agreed to do so, stating that he

---

Recognizing this renaming, we employ the terms Superior Court and judge of the Superior Court.

[2] At trial, Burton identified Lake as "Big Soup."

would arrive the next day on the 11:00 or 11:30 ferry. Smith, Lake and the unidentified individual subsequently wrapped Burton in a sheet, tied an extension cord around his ankles and stuffed a sock into his mouth. After putting something over Burton's head and placing him in a bathtub, they left him alone in the apartment. They said that they would return the next day to have Burton retrieve the cocaine from his friend at the ferry dock.

After his assailants had left, Burton managed to free himself. He recovered his wallet. He discovered that $100 in cash was missing and left the apartment. He ran to a nearby supermarket to call the police, but the telephone there was out of service. He continued running, occasionally hiding behind bushes to avoid detection by his assailants. He ran until he reached an area known as Thomasville, where he called a friend. That friend drove Burton to a police station in Four Winds Plaza, where Burton reported what had happened to him.

From inside the police station, Burton observed that the car in which his assailants had driven him to Bovoni was within sight at a nearby gas station. Burton identified Smith to police officers, who approached the car, arrested Smith and placed him in a holding cell. Neither Lake nor the unidentified individual was in or near the car. Accompanied by Burton, the officers drove to an area of St. Thomas referred to as Ras Valley to search for Lake, whom they did not immediately find. Thereafter, they drove to the Bovoni apartment.[3]

The Government of the Virgin Islands (the "Government") subsequently charged Smith and Lake in an eighteen-count amended information. Smith was charged with kidnapping for ransom, false imprisonment, first-degree assault, first-degree robbery and grand larceny. The amended information also charged Smith with four counts of using a dangerous weapon during the commission of four of the other charged offenses.

A jury trial was held on December 10, 2004. The jury found Smith guilty of kidnapping for ransom, false imprisonment, first-degree assault and grand larceny. The jury found him not guilty of first-degree robbery and all four counts of using a dangerous weapon during the commission of the other charged offenses.[4]

---

[3] Lake was arrested the following day, April 9, 2004.

[4] The jury returned the same verdict with respect to Lake.

On January 26, 2005, Smith was sentenced to life in prison for the kidnapping for ransom conviction[5] and ten years of prison each for the first-degree assault and grand larceny convictions. All three sentences were ordered to run concurrently.

This timely appeal followed. Smith raises three main issues for our review: (1) whether his kidnapping for ransom conviction is supported by sufficient evidence; (2) whether the prosecution's allegedly impermissible comments during closing argument warrant reversal; and (3) and whether his counsel was ineffective.

## II. DISCUSSION

### A. Jurisdiction

This Court has jurisdiction to review criminal judgments and orders of the Superior Court in cases in which the defendant has been convicted, and has not entered a guilty plea. *See* V.I. CODE ANN. tit. 4, § 33 (2006); 48 U.S.C. § 1613(a) (2006).[6]

### B. Standard of Review

#### 1. Sufficiency of the Evidence

We exercise plenary review over a sufficiency-of-the-evidence claim. *United States v. Miller*, 527 F.3d 54, 60 (3d Cir. 2008). Under that standard, we must be "particularly deferential" to the jury's verdict. *United States v. Peppers*, 302 F.3d 120, 125 (3d Cir. 2002) (internal quotation marks and citation omitted). We must sustain the jury's verdict

---

[5] The trial court ruled that Smith's false imprisonment conviction was merged with his kidnapping for ransom conviction.

[6] The Government asserts that this Court does not have jurisdiction over this appeal. It contends that on January 26, 2005 — the date on which judgment was entered against Smith — no statutory provision vested this Court with jurisdiction to hear appeals from the Superior Court. We addressed a similar contention by the Government in *Joseph v. People of the Virgin Islands*, 50 V.I. 873 (D.V.I. App. Div. 2009). In *Joseph*, the defendant filed a notice of appeal with this Court on January 16, 2005. We concluded that this Court was not divested of jurisdiction "until the Supreme Court [of the Virgin Islands] certified that it was ready to accept jurisdiction." *Id.* at 882. We noted that because the Supreme Court assumed jurisdiction on January 29, 2007, this Court retained jurisdiction over the defendant's appeal. That reasoning applies with equal force in the matter now before us. Smith's notice of appeal was filed on January 28, 2005, well before the Supreme Court of the Virgin Islands certified its readiness to assume jurisdiction. As such, this Court has jurisdiction over Smith's appeal.

"if there is substantial evidence, taking the view most favorable to the Government, to support it." *United States v. Voigt*, 89 F.3d 1050, 1080 (3d Cir. 1996) (internal quotation marks and citation omitted). That is, the jury's verdict must stand if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt[.]" *Id.* (quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979) (emphasis in original)). Overall, "a claim of insufficiency of the evidence places a very heavy burden on an appellant." *United States v. Gonzalez*, 918 F.2d 1129, 1132 (3d Cir. 1990) (internal quotation marks and citation omitted).

## 2. Prosecutorial Misconduct

A reviewing court employs "a harmless error analysis when deciding whether a new trial is warranted because of improper remarks made by the prosecutor during closing arguments." *United States v. Gambone*, 314 F.3d 163, 177 (3d Cir. 2003) (citing *United States v. Zehrbach*, 47 F.3d 1252, 1265 (3d Cir. 1995) (en banc)). "The harmless error doctrine requires that the court consider an error in light of the record as a whole, but the standard of review in determining whether an error is harmless depends on whether the error was constitutional or non-constitutional." *Zehrbach*, 47 F.3d at 1265. "Improper conduct only becomes constitutional error when the impact of the misconduct is to distract the trier of fact and thus raise doubts as to the fairness of the trial." *Marshall v. Hendricks*, 307 F.3d 36, 67 (3d Cir. 2002) (citing *Berger v. United States*, 295 U.S. 78, 88, 55 S. Ct. 629, 79 L. Ed. 1314 (1935)). "[N]on-constitutional error is harmless when 'it is highly probable that the error did not contribute to the judgment.' " *Id.* (quoting *Government of Virgin Islands v. Toto*, 12 V.I. 620, 529 F.2d 278, 284 (3d Cir. 1976)). " 'High probability' requires that the court possess a 'sure conviction that the error did not prejudice' the defendant." *Id.* (quoting *United States v. Jannotti*, 729 F.2d 213, 219-20 (3d Cir. 1984)). "If the error was constitutional, the court may affirm 'only if the error is harmless beyond a reasonable doubt.' " *Id.* (quoting *United States v. Molina-Guevara*, 96 F.3d 698, 703 (3d Cir. 1996)).

## 3. Ineffective Assistance of Counsel

To prevail on an claim of ineffective assistance of counsel, a defendant must show both deficiency in performance and prejudice. *Strickland v.*

*Washington*, 466 U.S. 668, 700, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). "The 'deficiency' step asks whether counsel's conduct 'fell below an objective standard of reasonableness' viewed as of the time it occurred." *United States v. Baird*, 218 F.3d 221, 226 (3d Cir. 2000) (quoting *Strickland*, 466 U.S. at 688, 690; citing *United States v. Gray*, 878 F.2d 702, 711 (3d Cir. 1989)). "The 'prejudice' prerequisite asks whether 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " *Id.* (quoting *Strickland*, 466 U.S. at 694; citing *United States v. Headley*, 923 F.2d 1079, 1083 (3d Cir. 1991)).

## III. ANALYSIS

### A. Sufficiency of the Evidence

Smith argues that there was insufficient evidence at trial to sustain his kidnapping for ransom conviction.

The offense of kidnapping for ransom is codified at title 14, section 1052(a) of the Virgin Islands Code ("Section 1052(a)"). Section 1052(a) provides:

> Any person who seizes, confines, inveigles, entices, decoys, abducts, conceals, kidnaps or carries away any individual by any means whatsoever with intent to hold or detain, or who holds or detains, such individual for ransom, reward or to commit extortion or to exact from any person or entity any money or valuable thing, . . . is guilty of kidnapping for ransom and shall be imprisoned for life.

V.I. CODE ANN. tit. 14, § 1052(a). To convict Smith of kidnapping for ransom, the Government needed to prove beyond a reasonable doubt that Smith (1) seized, confined or abducted Burton; (2) with the intent to hold or detain him; (3) for ransom, reward or to exact from any person any money or valuable thing. *See Gov't of the Virgin Islands v. Baron*, 48 V.I. 88, 95 (V.I. Super. Ct. 2006).

Smith first argues that the first element lacks sufficient evidentiary support.

In *Government of Virgin Islands v. Berry*, 16 V.I. 614, 604 F.2d 221 (3d Cir. 1979), the Third Circuit articulated four factors to consider

in determining whether an asportation or detention rises to the level of kidnapping under Virgin Islands law[7]:

> (1) the duration of the detention or asportation; (2) whether the detention or asportation occurred during the commission of a separate offense; (3) whether the detention or asportation which occurred is inherent in the separate offense; and (4) whether the asportation or detention created a significant danger to the victim independent of that posed by the separate offense.

*Id.* at 227. The Third Circuit further explained that "with respect to a statute containing a mandatory life imprisonment term, the statutory language must be narrowly construed." *Id.* at 228.

In the events giving rise to the *Berry* case, there were three separate circumstances that might have constituted a kidnapping. *Id.* at 227-29. The *Berry* Court found that only one of those circumstances amounted to a confinement, abduction, carrying away, inveigling, enticement, decoying or concealment. *Id.* at 228. That circumstance involved a brief car ride. The defendants enticed the victim, an acquaintance, into a car by promising him a ride to town, but instead took him to a beach. *Id.* at 223. The *Berry* Court rejected the notion that such a car ride amounted to kidnapping because it was, among other things, too brief. *See id.* at 228-29.

■ Here, the evidence at trial reflects that the entire transaction at the Bovoni apartment lasted approximately one hour, not counting the time Smith spent tied up in the bathtub. [*See* Appellant's App'x Vol. I at 124.] Smith estimated that after his assailants left the apartment, he waited a few minutes before attempting to free himself. [*See id.* at 133.] Thus, Burton's detention was substantially longer than that of the victim in *Berry.* Furthermore, Burton's detention, at least from his assailants' viewpoint, was to last until at least the following morning, barring unforeseen contingencies. That is, Burton's otherwise open-ended detention was cut short only on his own initiative. We have no doubt that these circumstances suffice to constitute a confinement for kidnapping

---

[7] The *Berry* Court specifically stated that "whether a defendant has engaged in kidnapping as defined by section 1052 of the Virgin Islands Code must be determined in light of these four considerations." 604 F.2d at 227.

purposes. The first *Berry* factor therefore weighs in the Government's favor.

The second *Berry* factor asks whether the kidnapping "occurred at a different time than the other offense." *Gov't of the Virgin Islands v. Ventura*, 775 F. 2d 92, 93 (3d Cir. 1985). In this case, Burton's confinement and the separate offense — namely, the assault on his person — occurred practically simultaneously.

The third *Berry* factor asks whether the detention was inherent to a separate offense. In addition to kidnapping for ransom, Smith was charged with first-degree assault, first-degree robbery and grand larceny. Importantly, none of those other offenses require that a victim be bound, gagged and confined indefinitely in an empty apartment for a significant period of time. Burton's detention was therefore not inherent to the crime of kidnapping for ransom. *Cf. Berry*, 604 F.2d at 228 (reasoning that "some limited confinement or asportation" is inherent in an assault).

The fourth *Berry* factor calls for a determination whether the victim was subjected to any greater danger as a result of his detention. There is no question that Burton was so subjected. By binding Burton's limbs, Smith and his co-assailants risked slowing or even cutting off Burton's blood flow. Because a sock was stuffed into his mouth, Burton might well have choked or suffocated. Furthermore, because he was left alone in an empty apartment for what could have been an indefinite length of time, Burton was exposed to the eventuality of severe thirst and starvation, and perhaps even death. Given these myriad possibilities, we have no trouble concluding that Burton was subjected to extreme danger during his detention. This factor therefore weighs strongly in the Government's favor.

Considering the four-part test set forth in *Berry,* we find that the evidence adduced at trial, viewed in the light most favorable to the Government, was sufficient to support the first element of Smith's kidnapping for ransom conviction.

Smith also asserts that the third element of his kidnapping for ransom conviction lacks sufficient evidentiary support. His challenge with respect to that element is twofold. First, he contends that there was insufficient evidence that Burton was held for something of value. Specifically, he argues that the Government adduced no evidence "that twenty kilograms

of cocaine constituted money or a valuable thing."[8] [Appellant's Br. at 15.]

■ Section 1052(a), as noted above, speaks of "ransom" or "any money or valuable thing." V.I. CODE ANN. tit. 14, § 1052(a). Neither the statute itself nor any other provision of Virgin Islands law defines those terms. "Ransom" is defined as "[m]oney or other consideration demanded or paid for the release of a captured person or property." BLACK'S LAW DICTIONARY (8th ed. 2004). "Consideration" is "[s]omething (such as an act, a forbearance, or a return promise) bargained for and received by a promisor from a promisee." *Id.* "Valuable" means "[w]orth a good price [or] having financial or market value." *Id.*

■ Despite the sparse case law from other jurisdictions on this point, we have no doubt that twenty kilograms of cocaine, when demanded in exchange for the release of a kidnapping victim, constitutes consideration, and therefore ransom. We are just as certain that a measurable amount of a controlled substance has market value and therefore constitutes a valuable thing, as that term is contemplated by Section 1052(a).[9] *See, e.g., United States v. McClurge*, 311 F.3d 866, 868 (7th Cir. 2002) (affirming a kidnapping conviction where the defendant "demand[ed] cocaine and money in exchange for [the victim's] safe return"); *United States v. Pelaes*, 790 F.2d 254, 259-60 (2d Cir. 1986) (affirming a kidnapping for ransom conviction where "the evidence was sufficient to permit the jury to infer that . . . [the defendant] . . . assumed a major role in the holding of [the victim] and the demand for the return of the cocaine in exchange for [the victim's] release."); *State v. Green*, 660 So. 2d 935, 940 (La. Ct. App. 1995) (affirming an aggravated kidnapping conviction where there

---

[8] Smith also maintains that the Government was required to present evidence about the monetary value of the amount of cocaine. That argument is singularly unpersuasive. Section 1052(a) clearly speaks in the disjunctive and encompasses exacting "any money or valuable thing." Smith offers no authority for the proposition that the Government is required to attach a financial figure to a "valuable thing."

[9] Burton testified that the market value of twenty kilograms of cocaine was "over two hundred and something thousand dollars." [Appellant's App'x Vol. I at 126.] Furthermore, courts regularly recognize that cocaine has market value. *See, e.g., Dye v. Frank*, 355 F.3d 1102, 1105 (7th Cir. 2004) ("Our research indicates that cocaine has a market value of approximately $80 per gram."); *United States v. Hill*, 142 F.3d 305, 311 (6th Cir. 1998) (stating that one gram of cocaine has a market value of $83); *Lynn v. West*, 134 F.3d 582, 590 (4th Cir. 1998) ("A review of several federal cases . . . indicates that the market value for a kilogram of cocaine is about $25,000.").

was evidence that the victim was seized in order to force his father "to give up money and drugs in exchange for his son's release"). Accordingly, we are unconvinced by Smith's argument in this vein.

Smith's second challenge with respect to the third element of his kidnapping for ransom conviction is that there was no evidence that Burton was detained in exchange for twenty kilograms of cocaine. That argument is belied by the record.

■ At trial, Burton testified that after his assailants had repeatedly beaten him, they forced him to call his friend in Tortola and to ask that friend to bring cocaine to St. Thomas for the assailants. Burton further testified that his assailants made him tell his friend that Burton would die if the cocaine was not delivered. [*See* Appellant's App'x Vol. I at 122.] Burton later testified that after being tied up and left in a bathtub in the Bovoni apartment, his assailants told him that they would come back for him the next morning and take him to the ferry to retrieve the cocaine from his friend. Under oath, Burton stated that the cocaine was his ransom. [*See id.* at 126.]

There can be little doubt that this evidence was sufficient for the jury to infer that Burton was being detained in exchange for something of value, namely, cocaine. *See, e.g., People v. Ordonez*, 226 Cal. App. 3d 1207, 277 Cal. Rptr. 382, 396 (Cal. Ct. App. 1991) (finding that there was sufficient evidence that the defendant had detained the victim "for the purpose of obtaining either drugs or money" where the defendant placed the victim in a trunk and told his wife to deliver money), *review denied*, No. S019654, 1991 Cal. LEXIS 1429 (Cal. Mar. 28, 1991).

Accordingly, Smith's kidnapping for ransom conviction will be affirmed.

## B. Prosecutorial Misconduct

■ Smith contends that reversal is warranted because of the Government prosecutor's allegedly improper comments during summation. Smith did not object to these comments before the trial court. As a consequence, our review is for plain error. *See United States v. Morena*, 547 F.3d 191, 193 n.1 (3d Cir. 2008); *United States v. Rose*, 538 F.3d 175, 177 n.3 (3d Cir. 2008). To establish plain error, Smith must establish that "(1) there was error, i.e., a deviation from a legal rule, (2) the error is clear under the law at the time of appellate review, and (3) the

error affected substantial rights, i.e., affected the outcome of the proceedings." *United States v. Vitillo*, 490 F.3d 314, 325 (3d Cir. 2007) (citations omitted). If Smith proves all of these elements, we may, in our discretion, reverse his conviction, *Johnson v. United States*, 520 U.S. 461, 467, 117 S. Ct. 1544, 137 L. Ed. 2d 718 (1997), "but only if [he] is actually innocent or the error seriously affects the fairness, integrity or public reputation of judicial proceedings," *Vitillo*, 490 F.3d at 325 (alteration, quotation marks and citation omitted).

Smith pinpoints three sets of comments by the prosecutor for our consideration.

In the first set of comments, the prosecutor described the defendants as "thugs" and their conduct as "thuggish":

> This was an organized plan. This was a scheme, organized by these two defendants because they thought they were better thugs. . . . Again, better thugs.
>
> . . . .
>
> So [the defendants] were the ones who were suckered in by being so confident and cocky that because of their thuggish behavior they could intimidate [Burton].
> Well, they didn't.

[Appellant's App'x Vol. II at 589-90, 660.]

The second set of comments Smith characterizes as improper bear on Lake's truthfulness:

> But Mr. Lake tells us yesterday . . . there was no dread locks, no Rastafarian in the car. . . . And he insisted it was just three of them in the car when, in fact, it was four of them and they've already admitted. Inconsistency is a lie.
>
> . . . .
>
> Again, Mr. Lake said, on cross-examination, he's not a gun man. He has been shot three times. . . . But then he goes, I'm not a gun man. . . . But when Exhibit 11 was presented to him he admitted. Another lie.
>
> . . . .
>
> I just wanted to point out, you know, the lies of Mr. Lake since he did testify here.

[*Id.* at 586, 593, 657.]

■ The third comment that Smith brands as improper was uttered immediately before the end of the prosecutor's rebuttal argument: "We can't correct every injustice in the Virgin Islands but we can deal with this injustice today." [*Id.* at 661.]

With respect to the first set of comments, the prosecutor's characterization of Smith and his co-defendant as thugs and their conduct as thuggish arguably falls beyond the bounds of propriety. *See, e.g., United States v. Fields*, 483 F.3d 313, 360 (5th Cir. 2007) (assuming *arguendo* that the prosecutor's description of the defendant as a "psychopath" was "clearly or obviously improper" because it "had some risk of inflaming the jury"), *cert. denied*, 552 U.S. 1144, 128 S. Ct. 1065, 169 L. Ed. 2d 814 (2008); *United States v. Stover*, 474 F.3d 904, 917 (6th Cir. 2007) (noting that calling the defendant a drug-dealer "is not model prosecutorial conduct"), *cert. denied*, 552 U.S. 860, 128 S. Ct. 142, 169 L. Ed. 2d 98 (2007). According to Smith, the prosecutor employed those characterizations in an effort to "dehumanize" him and "to create disconnect between the jury" and him. [Appellant's Br. at 24.] That contention, even if accepted as true, in no way demonstrates that Smith would not have been convicted if the prosecutor had omitted those characterizations.

First, the trial judge explicitly instructed the jury to "decide any factual matter or issue based on the evidence and only the evidence." [Appellant's App'x Vol. II at 664.] The trial judge added that "[s]tatements, questions, comments by attorneys representing the parties is not evidence. . . . [C]losing arguments by counsel is not evidence and may not be regarded as such." [*Id.* at 666-67.] These instructions ensured that the jury knew that it alone was to decide Smith's guilt on the basis of the evidence before it and not the prosecutor's comments. *See, e.g., Fields*, 483 F.3d at 360 (finding no reversible error despite the prosecutor's description of the defendant as a "psychopath" where, *inter alia*, the trial judge told the jury that "statements or arguments made by the lawyers are not evidence and are not binding upon you") (alteration and quotation marks omitted).

Second, after an exhaustive review of the record, we are convinced that Smith would have been found guilty even if the prosecutor had not used the words "thug" and "thuggish." Burton's long, graphic and highly detailed testimony about having been physically abused and confined in the Bovoni apartment was largely unrebutted. Indeed, Lake even admitted

726

on the stand that he had helped bind Burton. [*See* Appellant's App'x Vol. I at 374-75, 380; Vol. II at 488.] In brief, there is powerful evidence of Smith's guilt. *See, e.g., Fields*, 483 F.3d at 360 (finding no reversible error despite improper comments by the prosecutor "[i]n light of . . . the strength of the evidence against [the defendant]"); *United States v. Boyd*, 312 U.S. App. D.C. 35, 54 F.3d 868, 872 (D.C. Cir. 1995) (similar); *United States v. Swinehart*, 617 F.2d 336, 339-40 (3d Cir. 1980) ("The record developed at trial persuades us that the jury would have convicted [the defendant] even had it not been exposed to the improper prosecutorial comments.") (footnote omitted).

Because Smith has identified no prejudice flowing from the first set of comments, he is not entitled to a reversal on their account. *See, e.g., Stover*, 474 F.3d at 917 (finding no reversible error notwithstanding an improper comment because "there is no strong showing of prejudice").

 The prosecutor's comments regarding Lake were likewise improper. Comments about the truth or falsity of any testimony or evidence, even if based on record evidence, are generally improper. *See Swinehart*, 617 F.2d at 339; *United States v. Le Fevre*, 483 F.2d 477, 479 (3d Cir. 1973); *United States v. Schartner*, 426 F.2d 470, 477 (3d Cir. 1970); *United States v. Meisch*, 370 F.2d 768, 773 (3d Cir. 1966); *see also United States v. Hernandez-Muniz*, 170 F.3d 1007, 1012 (10th Cir. 1999) ("We have characterized as unnecessary and unwarranted a prosecutor's closing argument in which he called the defendant a liar and told the jury that defendant had not told the complete truth.") (quotation marks and citation omitted).[10]

 Smith argues that the prosecutor's several comments about Lake's lies "invade[d] the province of the jury." [Appellant's Br. at 24.] We disagree.

---

[10] It bears noting that some circuits see no impropriety where a prosecutor uses the word "lie" in the context of the defendant's credibility. *See United States v. Catalfo*, 64 F.3d 1070, 1080 (7th Cir. 1995) ("Where the character and credibility of the defendant are at issue and the evidence allows the inference that the defendant has been less than truthful, the prosecutor does not err in closing argument by referring to the defendant as a liar."); *United States v. Dean*, 312 U.S. App. D.C. 75, 55 F.3d 640, 665 (D.C. Cir. 1995) (reasoning that a prosecutor may use the word "lie" in context provided he "sticks to the evidence and refrains from giving his personal opinion"); *United States v. Jacoby*, 955 F.2d 1527, 1540-41 (11th Cir. 1992) (finding that the prosecutor's comments that certain testimony was an " 'absolute lie[,]' . . . although colorful and perhaps flamboyant, . . . were neither improper nor unduly prejudicial").

First, Smith makes no effort to explain how the prosecutor's comments about Lake's truthfulness bear on the jury's conclusion about Smith's own credibility. Indeed, Smith elected not to testify at trial. His credibility was therefore not at issue.

Second, the prosecutor's comments about Lake's truthfulness were isolated and occupied but fleeting moments of several hundred pages of trial transcript. *See, e.g., Gambone*, 314 F.3d at 180 ("[T]he prosecutor's objectionable comment amounts to less than half of a page out of over 3200 pages of trial transcript prior to jury deliberations. It represented only a fleeting moment in a four-week trial, in which the court sustained more than 200 objections by the defendant."); *Zehrbach*, 47 F.3d at 1267 ("Although it is true that irreparable harm may be inflicted in a moment, the comments at issue were but two sentences in a closing argument that filled forty pages of transcript.").

Third, the trial judge specifically instructed the jury that it alone was "the sole and exclusive judge of the credibility of each of the witnesses called to testify in this case." [Appellant's App'x Vol. II at 669.] The trial judge further instructed the jury to "determine to what extent the testimony of the defendant is credible, and the testimony of the defendant is to be judged the same as any other witness." [*Id.* at 721.] These instructions mitigated any ill effects of the prosecutor's comments about Lake's testimony by unequivocally putting the jury on notice that those comments were not to be considered in deciding whether Lake was a credible witness. *See, e.g., Hernandez-Muniz*, 170 F.3d at 1012 (finding no reversible error where the prosecutor described the defendant's statements as "lies" because "the trial court instructed the jury that counsels' comments did not constitute evidence and that the jury was the sole judge of witness believability").

Fourth, the prosecutor's comments about Lake's credibility bore on minor details — namely, how many people were in the car at Post Office Square and whether Lake had ever been convicted of a crime — that are unrelated to the actual conduct giving rise to Smith's conviction: Burton's confinement in exchange for ransom or a valuable thing. *See, e.g., Vitillo*, 490 F.3d at 326 (finding no reversible prosecutorial misconduct where the evidence of guilt stood "apart from the disputed confession that gave rise to the . . . misconduct").

Finally, as discussed above, the evidence of Smith's guilt is substantial. *See, e.g., Jacoby*, 955 F.2d at 1541; *Le Fevre*, 483 F.2d at 479

(disapproving of the prosecutor's comments on credibility but finding them insufficiently "prejudicial, in light of the overwhelming evidence against defendant, to constitute reversible error").

For these reasons, we do not find that the outcome of Smith's trial would have been different had the prosecutor abstained from commenting on Lake's truthfulness.

 With respect to the third comment, we disagree with Smith's assessment that the prosecutor prejudiced him by inviting "the jury to right unpunished wrongs . . . by rendering a verdict of guilty in this case." [Appellant's Br. at 25.] In asking the jury to correct an injustice, the prosecutor was merely doing what a competent prosecutor would do during closing argument in any case: ask the jury for a guilty verdict. There was certainly nothing overtly incendiary or offensive about the way in which the prosecutor did so here. *See, e.g., United States v. Walther*, 867 F.2d 1334, 1340-41 (11th Cir. 1989) (finding no prosecutorial misconduct where "the prosecutor . . . used no inflammatory language [when] ask[ing] for a guilty verdict and explain[ing] why it was important that [it] be the right verdict for the right reasons") (quotation marks omitted).

In short, none of the comments about which Smith complains warrant reversal.

 While reversal is unwarranted on this ground, we are mindful that this is not the first time we have been confronted with improper prosecutorial comments or conduct. We recognize that a "prosecutor is entitled to considerable latitude in summation to argue the evidence and any reasonable inferences that can be drawn from that evidence." *United States v. Werme*, 939 F.2d 108, 116 (3d Cir. 1991) (citing *United States v. Scarfo*, 685 F.2d 842, 849 (3d Cir. 1982)). Such leeway notwithstanding, "prosecutors have a special and solemn duty to refrain from improper methods of obtaining a conviction." *Morena*, 547 F.3d at 193. Indeed, as the Supreme Court long ago taught, a prosecutor "may prosecute with earnestness and vigor — indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones." *Berger v. United States*, 295 U.S. 78, 88, 55 S. Ct. 629, 79 L. Ed. 1314 (1935). We therefore admonish all prosecutors in the Virgin Islands to keep their comments and conduct squarely within permissible bounds.

## C. Ineffective Assistance of Counsel

Smith contends that he was denied effective assistance of counsel in violation of the Sixth Amendment. In his view, his trial counsel should have objected to the Government's allegedly improper comments during closing argument.

■ "It is well settled . . . that Sixth Amendment ineffective assistance of counsel claims . . . are generally not entertained on a direct appeal." *United States v. McLaughlin*, 386 F.3d 547, 555 (3d Cir. 2004) (citation omitted). "This refusal to entertain . . . claims on direct review stems from the reality that such claims frequently involve questions regarding conduct that occurred outside the purview of the [trial] court and therefore can be resolved only after a factual development at an appropriate hearing." *Id.* (citations and quotations omitted). There is a narrow exception to this rule: "[W]here the record is sufficient to allow determination of ineffective assistance of counsel, an evidentiary hearing to develop the facts is not needed." *United States v. Headley*, 923 F.2d 1079, 1083 (3d Cir. 1991). However, "[w]here a claim of ineffective assistance of counsel is based on attorney incompetence, the lack of a fully developed record often precludes a comprehensive inquiry into the elements of strategy or tactics that may have entered into defense counsel's challenged decision." *McLaughlin*, 386 F.3d at 556 (citing *Gov't of Virgin Islands v. Zepp*, 748 F.2d 125, 133 (3d Cir. 1984)).

■ The record in this matter does not permit us to consider the reasonableness of the trial strategy of Smith's counsel. Specifically, the record is inadequate for a determination to be made about his counsel's decision not to object to the Government's comments during closing argument. Because Smith's ineffective assistance of counsel argument does not "fit[ ] into that narrow class of ineffectiveness claims amenable to review on direct appeal," *McLaughlin*, 386 F.3d at 556, it is premature and better left for collateral attack. Accordingly, we decline to address this argument.

## IV. CONCLUSION

For the reasons discussed above, we will affirm Smith's conviction in all respects. An appropriate judgment follows.